## HASBROUCK VS. THE CITY OF MILWAUKEE.

A contractor agreed to furnish all materials and construct a harbor in a city in accordance with a plan and specifications therefor made by the city engineer, and if any alterations in the plan of said work should be made which should materially increase the expense, and the person or persons appointed by the city to oversee the said work and direct in relation thereto could not agree with the contractor as to the value of such extra work, the same was to be fixed by three disinterested persons, to be chosen in a manner specified in the contract. Monthly estimates were to be made by the city engineer, of the work performed and materials furnished, and the contractor was to receive ninety per cent. of such estimates. The work was to be done " under the survey and directions of the city engineer, acting under the direction and approval of the harbor committee," and if any material alterations in said work were desired by the city, the same were to be directed in writing, to be signed by the engineer and indorsed by the harbor committee of the city; and the appraisal of the difference of expense by the appraisers above referred to, was to be made in writing. If the materials mentioned in the specifications should fall short of completing the work agreeably to the plan, the contractor was to have extra compensation; and if they should exceed the amount required, a deduction was to be made; and the value of such excess or deficiency was to be fixed by the engineer, and his determination thereof was to be conclusive between the parties. And in case there should be any misunderstanding between the parties in relation to the true construction and meaning of said plan or specifications, the decision of the city engineer thereon was also to be conclusive between them. An important change was afterwards made in the plan of the work, greatly enhancing its cost; but the original contract was not wholly lost sight of, and the work progressed under it so far as its stipulations could be made applicable to the new plan. No arbitrators were in fact appointed to estimate the value of the extra work and materials. In an action by the contractor against the city to recover a balance alleged to be due him for work and materials, *Held*, that the court erred in regarding the engineer's estimate of the value of the extra work and materials as conclusive against the city, and refusing to receive evidence offered by it as to their actual value.

This court understands the contract as meaning that all disputes between the parties as to the gross value of such extra work done and materials furnished by reason of a change in the plan of the harbor, were to be decided by arbitrators; and no arbitration having been had, the question should have been submitted to the jury upon evidence furnished by the parties as to the real value of such work and materials.

Upon the evidence in this cause the court should not have submitted to the jury the question whether, after the change above mentioned in the plan of the harbor, it was understood between the city and the contractor that the work should proceed upon a cash basis, and be paid for in cash, or in city bonds at their cash value instead of their nominal value.

APPEAL from the Circuit Court for *Racine* County.

This action was brought in the circuit court for Milwaukee county, to recover a balance alleged to be due the plaintiff for work done and materials furnished by him in constructing three sections of a harbor at the "straight cut" in the city of Milwaukee, under a contract with the city. A demurrer to the complaint was sustained by said circuit court; and its decision was affirmed by this court, on appeal, at the June term, 1860. See 12 Wis. Rep., 47. After the cause was remitted, the judgment was vacated on the plaintiff's motion, and he was permitted to file an amended complaint. The cause was then removed to the circuit court for Racine county.

In 1854 the city of Milwaukee entered into a contract with one Hawley, for the construction of the first three sections of said harbor. The material provisions of the contract are stated in the opinion of the court. In June, 1855, Hawley assigned the contract, with the consent of the city, to one Barton; and on the 25th of that month the city entered into an agreement with Barton, which—after reciting that Barton had taken an assignment of the contract made with Hawley, and that, by a resolution of the common council passed on that day, the city had agreed to pay Barton $10,100 in addition to the amount expressed in the contract with Hawley, as a consideration for the completion of the work defined in said contract—was as follows: Barton was to construct the harbor in conformity with the contract with Hawley, subject to the alterations and restrictions therein mentioned, except as to the time of completion and manner of payments, and was to complete the same by the 1st of August, 1856, and was to receive therefor $59,000 in city bonds of the kind described in the contract with Hawley, less the sum of $21,000 previously issued. Payments were to be made monthly in proportion to the amount of work done or in a forward state of progress, to be estimated by the city engineer. If the city should alter the plan of said

work so as to increase the labor, the time of completion was to be extended, &c.

The complaint, as amended, alleges that on the 6th of August, 1855, the city, acting on the right reserved in both of said contracts, adopted, in lieu of the plan designated therein, one previously designed for the same object by the government of the United States; that Barton, during his life, by direction of the city authorities, proceeded with the construction of the harbor upon the plan adopted by this change; that the change greatly enhanced the cost of constructing said harbor, *inasmuch as the original plan could not be followed as a guide " even to the extent of the amount of the labor and materials contemplated and estimated as sufficient for the construction of said harbor upon such original plan;" that upon the adoption of this change of plan, it was understood and agreed between Barton and the city, through its officers, that all labor and materials furnished in constructing the harbor should be estimated at cash prices, and that Barton was to receive the bonds of the city no longer at par, but at their actual market value; that the labor and materials were in fact estimated at their cash value;* that in the early part of 1856 Barton died, leaving the harbor unfinished, and in May, 1856, his legal representative, with the consent of the city, assigned the contract to the plaintiff, who, at the special request of the city, entered in his own right upon the completion of the work, *upon the terms, conditions, stipulations and agreements existing between the city and said Barton as above alleged,* and completed the work on the " altered and governmental plan," to the satisfaction and acceptance of the city, about the 1st of January, 1858; that during the progress of the work, estimates were made from time to time by the city engineer, of the labor and materials furnished therefor by the plaintiff, *at a cash valuation, and said estimates amounted to, and the labor and materials furnished by the plaintiff were of the value of* $177,384.38; and that the plaintiff had received in part payment thereof one hundred and thirty-three bonds of said city, of the nominal value of $1000

each, but whose real net value, when received, was in the aggregate $103,707.50; that the plaintiff " entered upon the performance and completion of the work aforesaid, *with the understanding and agreement that Barton's work, labor and services subsequent to said change of plan, had been estimated to him upon a cash basis as aforesaid, and that he was to receive therefor an equivalent to cash, and the plaintiff went on with the work, and submitted to estimates by the said engineer in charge as aforesaid at actual cash valuations, in the belief and upon the understanding that he was to be paid in an equivalent to cash the value of his work, labor and services;* " that he is advised and submits that however the contracts in writing aforesaid might otherwise have been construed and held to operate, the city of Milwaukee *cannot now lawfully set up and insist that the plaintiff shall be charged with said bonds at par;* and that there was *due to the plaintiff at the commencement of this action* $73,676.83, *besides interest.*

The answer of the city, among other things, denied all the allegations of the complaint which are italicized above.

On the trial, the plaintiff introduced in evidence, among other things, the following : 1. An estimate made by the city engineer on the 8th of September, 1855, of the work done and materials furnished by Barton in building said harbor, up to that date, with prices affixed. There was indorsed upon this a protest signed by Barton, which, after stating that the prices allowed for certain portions of the work were too small, added : " The estimate within I understand to be cash price, and to be made or added to enough to make bonds cash. And also I expect fifteen per cent. added for contingencies, superintendence, furnishing money, &c., &c." 2. An estimate made by the city engineer on the 12th of January, 1858, of the " amount of materials furnished and used, and of work done by harbor contractors, in building sections one, two and three" of said harbor, with the prices for the several items, which he certified were not more than a reasonable compensation for the work done. One item of the estimated work was 94,400 cub-

ic yards of dredging, and another 2735 cords of stone, to neither of which was any estimate of price affixed. 3. An account presented to the common council of the city by the plaintiff, on the 25th of January, 1858, for the materials and work so furnished ; which account was in accordance with said estimate of the city engineer, except that 19,059 yards of dredging mentioned therein were charged at 30 cents per yard, and the remaining 75,341 yards were charged at 60 cents per yard, the stone were estimated at $12 per cord, and there was an additional item of 13,548 yards of dredging at 33 cents per yard. The city was credited with city bonds amounting (on their face) to $108,000, and was charged with a discount upon the same amounting to $18,880. The balance appearing due to the plaintiff by said account was $76,264.33. 4. A joint report of the " Harbor Committee" and the "Finance Committee," made to the city council on the 25th of January, 1858, it appearing that the account above mentioned was referred to said committees. In this report the committees say : " On the 6th of August, 1855, the common council abandoned the city plan of the work, and adopted that of the United States government, and the contractor was directed to construct the work on the government plan, and the city engineer was directed to make his estimates accordingly. This virtually abandoned the original contract, so far as the amount named therein for completing the work was concerned ; and the city engineer was directed to estimate at cash prices for each specific item of materials furnished and used in the work, and the common council paid the contractor upon such estimates of the city engineer, which are now on file in the city clerk's office." The report further states that the plaintiff has constructed the work " under the daily inspection and supervision of the city engineer, and has received from the city * * seventy-four harbor bonds of $1000 each, making the aggregate amount of harbor bonds issued to Hawley, Barton and *Mr. Hasbrouck*, $108,000. *Mr. Hasbrouck* presents a certified statement of the city engin-

eer, including therein all estimates given by him for materials furnished and used, and the work done, in constructing the first three sections of the harbor, which statement of estimates is herewith presented as a part of this report. In *Mr. Hasbrouck's* account against the city, the amount of materials furnished and used in this harbor work, agrees with the several amounts stated by the city engineer, and the prices charged agree with those fixed by the engineer, except for a part of the stone, and for 75,341 cubic yards of dredging, for which the engineer fixed no price, but states that in his judgment it must have cost the contractors fifty cents per cubic yard." The committees, after alluding to the charges made in said account for discount upon the bonds issued to Barton and those issued to the plaintiff, state that in their judgment the balance claimed by *Mr. Hasbrouck* is not unreasonable, and should be allowed and paid by the city. All the above evidence was admitted against the objections of the defendant.—Jackson Hadley, as a witness for the plaintiff, testified that he was a member of the common council of Milwaukee from the spring of 1853 to the spring of 1859, and that a harbor committee was constituted in the spring of 1854, of which he was chairman from 1854 to 1858. *Question:* "After the change of plan, were any directions given by the harbor committee to the city engineer as to estimates of prices? If so, state what they were." Objected to as irrelevant and immaterial, and on the grounds that the committee had no authority to give any directions, and that the directions, if any, should have been given in writing. Objection overruled. *Answer:* "After the change to the government plan, the committee instructed the engineer to fix the prices of the work in his estimates, and set them down at cash rates, as we had no means of fixing any other value on it. * * I may have been the member of the harbor committee who gave those directions to the engineer. The estimates made by the engineer up to the time of the change of plan, were all made of quantities merely, without prices, but after the adoption of

the government plan the estimates were of quantities with prices of the specific materials, including the labor of putting them in their place. I recollect that Mr. Mallory [another member of the harbor committee] agreed with me in directing the engineer to give prices in his estimates after the change of plan; think other members of the committee also approved it."—Jonathan Taylor, as a witness for the defendant, testified that he was a member of the common council of said city, and of the harbor committee, in 1856 and 1857. " There was an agreement between Mr. Hadley and Mr. Edwards, and *Mr. Hasbrouck*, in the spring of 1856. I was present then. The change of plan was talked of, and the additional timber, dredging and stone. By the talk at that time they were to have pay or work on the new plan adopted, in city bonds at their par value, in the same manner as under the old contract. The understanding all the way through was the same as it was before, under the original contract, as to the mode of payment in city bonds at their par value. In 1857, at the time of letting the contract for the fourth section, I was opposed to letting it without advertising for bids. *Hasbrouck* then urged as a reason why we should allow him liberal terms for the 4th section, that he had a hard contract on the first three sections, since he had to take bonds at par, and urged us therefore that we should let him have the new job on the 4th section at the prices paid in cash. On this occasion *Hasbrouck* distinctly said that he had only bonds at par on the old job.—In 1855, the harbor committee consisted of three members, in 1856 of five members, and in 1857 of nine members."—George S. Mallory, for the defendant, testified that he was a member of the harbor committee in 1856 and 1857, and that the committee never made any contract, to his knowledge, with *Hasbrouck*, as to the mode of payment on harbor work, or as to paying in bonds at a cash price. He never knew that Mr. Hadley, or any member of the committee, or the committee itself, had any authority to make such a change. " Mr. Hadley was the acting, managing

man of that committee, and had more the control of the harbor business than any other man on the committee. I think the understanding was that estimates should be at cash prices after the change of plan. Estimates were never at any time made in any other way. I think the estimates were never made except on a cash basis after the change in plan."—H. Haertel, for the defendant, testified that he was a member of the council and harbor committee in 1855 and 1856, and that there was no change in the mode of payment made with *Hasbrouck*.—A. Greulich, for defendant, testified: " I was a member of the council, and on the harbor committee, in 1856 and 1857. I know of no agreement to pay *Mr. Hasbrouck* in cash, or in bonds at cash price, for any work on the three first sections. I know of no member of the committee having any authority to change the contract as to the mode of payment, or to direct any estimates to be made at cash rates, or to direct any change in the form of the estimates. I acted on the committee, but was away some of the time." Andrew McCormick, for the defendant, testified: "I was a member of the council in 1854 to 1858, and on the harbor committee in 1857 and 1858. I think there was an agreement at some time with *Hasbrouck*, for bonds at cash prices; that must have been in 1857 or 1858; was made in clerk's office; I was present; so was Mr. Hadley; contract was in writing I think; think I signed it; think it was at a time when Hadley locked the door, and said we should attend to that business before we left. I think the contract was with *Hasbrouck* and Conroe. I can't tell just when it was that the contract I spoke of was made in the clerk's office; all the committee were present. I was there; Hadley was there; I would not sign it until I had investigated the matter. Several members were there until late in the night. It was my understanding that *Hasbrouck* was to receive bonds at cash value for the whole. I investigated and found that he had received bonds under protest; and it was always my understanding that for the whole work he was to have bonds at their cash

VOL. XVII—18·

value. I think Mallory was there; he wanted to go home; Hadley locked us in and said we should investigate the whole matter; we did investigate it."

Ferdinand Kuehn, for defendant: "I was in the council in 1856 and 1857, and on harbor committee. I don't remember any such meeting as Mr. McCormick speaks of. I know of no agreement or understanding to change the mode of payment to the plaintiff. The harbor committee did not to my knowledge attempt to make any change, nor did it authorize any member of committee to make any change." On cross-examination he said: "Mr. Hadley was chairman, and had principal charge of the business of the committee." J. Hadley, recalled by defendant, and further cross-examined, said: "I presume Mr. McCormick refers to the meeting of the harbor committee in the clerk's office, after the first three sections were done, when the report in evidence was got up. Something of the kind he speaks of occurred then, but at no other time that I recollect. I insisted then on the committee going through with their work and making report. No agreement or understanding was ever made or had between the harbor committee and *Hasbrouck*, as to a change to a cash basis of payment, or payment in bonds at cash prices, or anything of the sort. There was never any agreement with him at all about payments or mode of payment. When or after the change in plan was made, Mr. Barton protested against receiving bonds at their par value. The committee never assumed to make any agreement one way or the other about it, but we had the estimates made with prices attached at cash value, and let the plaintiff stand on his legal rights. Before that the estimates had stated no price whatever. We had the engineer put in prices after that, on account of Barton's protest or complaint about taking bonds, and left it for them to settle afterwards."

*Question*, by plaintiff: "Did *Mr. Hasbrouck* ever protest to the committee against receiving the bonds at their par value?" Objected to as immaterial; and objection overruled. *Answer*:

"*Hasbrouck* never protested himself, that is to say, he never protested in form, but he always contended that he had the benefit of Mr. Barton's protest. He never protested in form to either the council or the committee, but always talked to me as though he had the benefit of Barton's protest. I never made any agreement with him about it, nor do I know that any one did." *Question*, by plaintiff: "Was it not your understanding, as a member of the council and harbor committee, from the time *Hasbrouck* took the job, that he was to take the bonds he received at only their cash value, and was not that the reason why special directions were given to the engineer to estimate the work at cash prices?" Objection overruled. *Answer:* "The reason why I gave directions to the engineer was, because Barton had protested, and that raised a question. I did not know about his having any right to any allowance on the bonds, and I did not mean to decide that, or have anything to do with it, but I thought the estimates should contain cash prices, and then if the contractors and the city had afterwards any differences they could settle them. The committee made no allowance, and did not assume to make or be able to make any allowances on the bonds, or about payments or prices. The harbor committee, like others, had no regular record of their actions, and their acts are only shown in reports to the council, or in directions, either in writing or oral, to the contractor."

The defendant made various offers of evidence to show the real value of the materials and work included within the above mentioned estimate of the city engineer; but the evidence was ruled out, on the ground that the engineer's estimate was conclusive. Testimony was received as to the items to which no price was affixed in the engineer's estimate; and also (against the defendant's objection) as to the market value of the bonds of said city in 1856, 1857 and 1858. *Mr. Hasbrouck*, as a witness in his own behalf, testified that he had heard that part of Mr. Taylor's testimony which represented him as hav-

ing urged as a reason why he should have the contract for the 4th section of the harbor, that he was obliged to take the city bonds at their par value upon his contract for building the first three sections; and that no such conversation ever took place.

The court gave the jury the following among other instructions: "If the jury find from the evidence, that after the work was commenced by Barton, under the written contract between said city and him, it was understood by and between said city and said Barton, that the plan of doing said work should be changed to the government plan, and that thereafter the work should proceed upon a cash basis, and be paid for in cash, or in bonds at their cash value and not their par value, and that after said contract became assigned to the plaintiff, and he began work under it, it was always understood by and between the plaintiff and the defendant, that the estimates of the work done by the plaintiff should be made at cash prices, and be paid for in cash, or in bonds at their cash value, then the defendant is only entitled to a credit on account of said 112 bonds (deducting from the 133 bonds paid, the 21 bonds paid to Hawley) to the amount of the market value of said bonds at the time when they were respectively paid." The court refused to give the following instruction, asked for by the defendant: "If the jury find from the evidence that extra work was done and material alterations made, then the estimates of the city engineer as to the value of such work are not conclusive, but the jury are to find from all the evidence what it was actually worth."

Verdict for the plaintiff for $73,000 damages. Motion for a new trial overruled, and judgment upon the verdict; from which the defendant appealed.

Most of the evidence and of the instructions given to the jury, or asked for by the defendant and refused, are here omitted, as the questions raised by them are not passed upon by this court.

*Jas. G. Jenkins*, for appellant.

*Emmons & Van Dyke*, for respondent.

*By the Court*, COLE, J.   In disposing of this cause we shall confine our attention mainly to a consideration of two questions which arise in various ways upon the record :   First. What effect must be given to the estimates of the city engineer as to any work done or materials furnished by reason of the change or alteration in the plan of the harbor which materially increased the expense of constructing it?   Second. Was there suficient evidence in the case to submit the question to the jury, whether, after the adoption of the government plan, it was agreed and understood between the city authorities and the contractors that thereafter the work should proceed upon a cash basis, and be paid for in cash, or in bonds at their cash or market value instead of their nominal value?'

There are several clauses in the contract which have an important bearing in the solution of the first question.   In the first place, the contractor agreed to furnish all materials and construct a harbor at the "straight cut" in the city of Milwaukee, "in accordance with the plan and specifications made by the city engineer," which were made a part of the agreement; was to perform an amount of work on said contract each month equal to one twelfth part of the first three sections ; "all of said work to be done in the most perfect and durable manner, and in accordance with said plan and specifications, subject to any alterations which the party of the first part may direct to be made, which shall not materially increase the expense of said work; and if any alterations in the plan of said work shall be made which shall materially increase the expense of constructing said work, if the person or persons appointed by said city to see the said work and direct in relation thereto, cannot agree with the party of the second part as to the value of such extra work, then the same shall be fixed by three disinterested persons, one of said persons to be selected

by each party, and the two so selected to select the third, and the decision of the three, or any two of them, to be conclusive between the parties."

Monthly estimates were to be made by the engineer, from time to time as the work progressed, of the work performed and materials furnished, and the contractor was entitled to receive ninety per cent. of the value of such estimates, or thereabouts. And in the event there should be an essential change in the plan of the improvement, as it was provided there might be in the above clause of the contract, and arbitrators should be chosen to determine the gross amount of the expense resulting from such change, then in that case, we suppose, it was intended the engineer should make monthly estimates for a like purpose, namely, to enable the contractor to recover a ratable share of the gross amount while prosecuting the work under the new plan. The contract likewise provided that " said work shall be done under the survey and directions of the city engineer, acting under the direction and approval of the harbor committee; and if any material alterations are desired by the party of the first part in said work, the same shall be directed in writing, to be signed by the engineer and indorsed by the harbor committee appointed by the party of the first part, and the appraisal of the difference of expense by the appraisers above referred to, shall be made in writing and filed with the clerk of the city ; and if the stone or timber, as specified in said specification, shall fall short of completing said work agreeably to said plan, then the party of the second part is to have extra compensation for the same; and if the materials in said estimate and specifications shall exceed the amount required, the value thereof is to be deducted, the value of such excess or deficiency to be fixed by the city engineer, and to be conclusive between the parties ; and in case there shall be any misunderstanding between the parties in relation to the true construction and meaning of said plan and specifications, or either of them, the same shall be

submitted to said city engineer for his instruction and determination, and his decision shall be conclusive between the parties."

There was a still further clause, which provided that ." the estimates of said chief engineer shall be conclusive between the parties to this contract, and when the whole contract shall be fully performed by said party of the second part, and the estimates fully made by said engineer, the party of the first part will then pay the balance which shall remain due and unpaid to the party of the second part on the bonds as aforesaid; the above sum of forty-eight thousand and nine hundred dollars being the consideration for the construction of said sections one, two and three."

After the work had progressed for a time, the city authorities resolved to change and alter the plan and mode of constructing the harbor, by abandoning the plan mentioned in the contract, and adopting in lieu thereof a plan proposed by the government of the United States. The change was a very material and substantial one, and greatly enhanced the cost and expense of constructing the harbor over the one first projected. But still, though the city plan was abandoned, yet the original contract was not wholly lost sight of, and the work progressed under it so far as its stipulations could be made applicable to the new plan. A great deal of additional work was done, and expensive materials were furnished, in consequence of the alteration of the plan, for which the city engineer made estimates. These estimates the circuit court held to be conclusive between the parties, and refused to permit the city to prove, on the trial, the actual value of the extra work and materials over and above what was called for by the original contract. And in support of this ruling it is contended, that the contract provides that such estimates shall be conclusive; and the principle is relied on, that when parties agree to rely upon the judgment and skill of an architect or engineer in determining the value of work and materials under contracts of this

character, then they must abide by the estimate of the umpire chosen, or impeach it upon sufficient legal grounds. There can be no doubt about the correctness of the principle of law invoked; and the only question is, does the contract provide that the estimates of the city engineer shall be conclusive as to the gross value of the extra work and materials when the plan was so changed as to materially increase the expense of constructing the work? It appears to us not. Of course, such a construction is to be placed upon this contract as will effectuate the intention of the parties, and give effect, if possible, to every part of it. It will be seen from the clause of the contract first above cited, that if any alteration in the plan of the work was made which should materially increase the expense of constructing it, then, in case of a disagreement between the persons appointed by the city to oversee the work and direct in relation thereto, and the contractor, arbitrators were to be selected to determine the value of the extra work. Now, although arbitrators in fact were never selected, yet indisputably there was a case of disagreement in regard to the value of extra work done by reason of the material change in the plan. This was the precise case provided for by the contract, when the judgment of arbitrators, and not the estimates of the city engineer, was to determine the value of the work. Upon certain materials embraced within the contract, it was agreed that the estimates of the city engineer should be conclusive. If the harbor had been constructed according to the original plan and specifications, then all matters of dispute growing out of the execution of that plan and specifications were to be conclusively and finally settled by the decision of the city engineer. But where disputes should arise as to the value of extra work and materials furnished in executing some new plan by which the expense of the improvement should be essentially increased, then a different tribunal was to settle them. The estimates of the city engineer were not to decide those matters. There was no agreement to submit those differences to his decision, and al-

though he might make estimates as to the gross value of such extra work, yet the estimates would conclude no one, because he was exceeding his powers. He had no right or authority to make them and bind the parties by his judgment. The contractor might prove that the extra work was worth more than he valued it in his estimates; the city might prove it to be worth less. This is the plain, precise meaning of the contract, as we understand it. And we suppose the contractor is entitled to recover for the extra work and materials just what he can prove them to be worth. The estimates of the city engineer upon those matters conclude no one. And we therefore think the court erred in holding them conclusive upon those subjects.

It is suggested upon the brief of the counsel for the respondent, that this clause in the contract refers to a disagreement between the city engineer and the contractor, in which case there was to be a reference to arbitrators. But this construction is clearly inadmissible, for the most obvious reasons. Upon all matters arising under the contract which the engineer had power to decide, there could be no disagreement. His decision upon those subjects was absolutely final and conclusive upon the parties. The contract so declared and provided. But all disputes as to the gross value of extra work performed or materials furnished by reason of the change in the plan of the harbor, the parties refused to submit to his judgment, but required them to be decided by arbitrators. And as no arbitrators have been chosen, they must now be settled by the verdict of a jury in the ordinary way.

Second. The court, in various instructions, in substance submitted to the jury the question, whether, after the work was commenced by Barton under the written contract between him and the city, it was understood between the parties that the plan should be changed to the government plan, and that thereafter the work should proceed upon a cash basis, and be paid for in cash, or in bonds at their cash value and not their

par value; and whether, after the contract was assigned to *Hasbrouck* and he began work under it, it was always understood that the estimates of the work should be at cash prices, and be paid for in cash or in bonds at their cash value. If the jury found from the evidence that such an understanding existed between the parties, they were directed to credit the city with the bonds paid on the contract at their cash value only. The written contract provided that the payment for constructing the harbor should be made in the bonds of the city "at their par value or face."

It was unquestionably competent for the parties to change the mode of payment and provide that the bonds should be taken at only their cash value, as it was competent for them to vary or abrogate any other stipulation of the written contract. But what is the evidence that they did so? McCormick, who was a member of the common council from 1854 to 1858, and the last two years of his office was on the harbor committee, thinks there was an agreement made some time in one of those years, that *Hasbrouck* was to take the bonds at cash prices. The other members of this committee, Taylor, Hadley, Mallory, Haertel, Greulich, Kuehn, swear pointedly and distinctly that no agreement or understanding was ever made or had between the harbor committee and *Hasbrouck*, as to a change to a cash basis of payment or payment in bonds at cash prices, or anything of the sort. They do say, or some of them at least, that after Barton protested against receiving the bonds at their par value, the city engineer was instructed to make his estimates on a cash basis, and let the contractor stand upon his legal rights. And we think Hadley very satisfactorily accounts for and explains the mistake of McCormick upon this point. We hardly think there was any evidence in the case from which a jury would have been authorized in finding that the mode of payment had been changed, and that the bonds were to be received at their cash value only. It is true, Barton, in September, 1855, insisted upon the estimates being

made upon a cash basis, and protested against being charged with bonds at par. But this circumstance is clearly insufficient to show a change in the contract in this respect. Indeed, the evidence, we think, most clearly and conclusively shows that no understanding or agreement of the kind was ever made or had between the parties.

It is claimed, however, as a matter of law, that when the parties mutually agreed to change the plan, so as to enhance the value of the work and increase the amount of labor and materials necessary for its construction, this operated as a change in the mode of payment. Conceding that this result would follow under ordinary circumstances, it appears to us it cannot in this case, for this reason. In the original contract the city reserved to itself the privilege of changing the plan of the improvement, even when such change might materially enhance the expense of constructing the work. Exercising this right of changing the plan could not, therefore, be attended with any such legal consequences as above suggested.

These observations, it is believed, dispose of the most material and important questions presented upon the record. The other points are of minor importance, and we do not deem it necessary now to dwell upon them.

The question as to the ratification of the contract by the city authorities, by procuring the passage of the law of 1857, and many other acts performed by its agents, was fairly left to the jury. But for the reasons above given there must be a new trial.

The judgment of the circuit court is reversed, and a *venire de novo* awarded.